## Stark et al. Appeal

*John G. Buchanan, Smith, Buchanan & Ingersoll, Eugene B. Strassburger, Jr., Strassburger & McKenna* and *Richard W. Ahlers,* for appellants.

*Anne X. Alpern,* City Solicitor, and *J. Howard Devlin,* assistant city solicitor, for zoning board of adjustment.

*Joseph R. Doherty* and *McCloskey, Best & Leslie,* for the Order of Franciscan Brothers.

ELLENBOGEN, J., June 26, 1950.—This case comes before us on appeal from the Board of Adjustment of

the City of Pittsburgh. The board issued an occupancy permit to the Third Order of St. Francis of St. Augustine Province of the Capuchin Order permitting the order to use a three-story stone building situated in the rear of its property "as sleeping quarters for retreatants during the conduct of closed spiritual retreats extending for a period longer than one day".

Upon presentation of the petition for an appeal, this court issued a writ of certiorari to review the decision, to which the board filed its return. On petition of the Third Order of St. Francis of St. Augustine Province of the Capuchin Order, the order was allowed to intervene as a party respondent and, as such, it filed an answer to the petition for appeal.

At the hearing, we deemed it necessary for a proper disposition of the appeal that testimony be taken.[1] The hearing consumed seven days and resulted in the taking of 482 pages of testimony, which have been transcribed and filed of record.

Petitioners are owners and residents of property adjoining the property of the order, or located in the vicinity thereof, on Beechwood Boulevard, in the area lying between the intersections of the boulevard with Reynolds and Hastings Streets, in the fourteenth ward of the City of Pittsburgh.

The Franciscan Fathers of the Capuchin Order are Roman Catholic priests. St. Augustine Province of the order includes the Commonwealth of Pennsylvania.

The Franciscan Fathers of St. Augustine Province of the Capuchin Order have under their supervision and direction a Roman Catholic retreat church located in the same area at the intersection of Beechwood Boulevard and Gettysburg Street, on property owned by the Third Order of St. Francis of St. Augustine Province of the Capuchin Order. This property con-

---

[1] Section 7 of the Act of March 31, 1927, P. L. 98.

sists of a large tract of land upon which are erected two buildings, one a very large house fronting on Beechwood Boulevard, and the other, a three-story building located in the rear of the property which was originally used as a stable and servants' sleeping quarters.

The area containing the property of petitioners and of the order is classified as a C residence district, the best residence classification established by the Zoning Ordinance of the City of Pittsburgh. This area contains within its confines expensive one-family dwellings.

The Capuchin Fathers are members of the First Order of St. Francis. Father Rupert Claid, a member of the First Order of St. Francis, is the director and in charge of the retreat church belonging to the third order. This is in accordance with the regulations of the Third Order of St. Francis, which is a religious organization of Roman Catholics, predominantly laymen, who seek in the third order a means of serving God, without withdrawing from their worldly pursuits. The members of the third order, men and women, advocate, practice, and sponsor public worship of Almighty God, in accordance with the beliefs and practices of the Roman Catholic Church, and with special emphasis on the teachings and practices of St. Francis of Assisi. The third order was founded in the year 1122.

The Third Order of St. Francis entered into an agreement for the purchase of the property involved on June 10, 1943, and acquired title thereto by deed from Mary Myler Kier, dated December 22, 1943, and recorded December 31, 1943, in the Recorder's Office of Allegheny County in Deed Book, vol. 2785, page 441. The articles of agreement for the purchase of the property provided that it should be considered void, in the event a certificate of occupancy could not be obtained for the third order to use the property as a church,

chapel, and retreat house. Mary Myler Kier made an appropriate application to the bureau of building inspection, which was denied, and the denial was sustained on appeal by the board of adjustment. Subsequent thereto, viz., on December 21, 1943, the order obtained from the bureau of building inspection an occupancy permit to use the main building which fronts on Beechwood Boulevard as a church. Since that time, the Third Order of St. Francis has used this building as a church for the conduct of Holy Mass and for the holding of Days of Recollection. The building does not serve as a church for the parish in which it is located.

The case before us originated on May 27, 1949, when the order made application to the bureau of building inspection for an occupancy permit to use the rear building on its property as a dormitory for retreatants during closed, spiritual retreats, lasting longer than one day. The bureau refused the application and an appeal was taken to the board of adjustment. The board held a public hearing on June 6, 1949, and on November 14, 1949, it granted a certificate of occupancy for the use of the rear building "as sleeping quarters for retreatants during the conduct of closed spiritual retreats extending for a period longer than one day."

These retreats usually last two days, from 6 p. m. Friday to 6 p. m. Sunday. They are known as closed retreats, because the person making the retreat is not permitted to leave the church grounds, from the time the retreat begins until it is concluded, except in case of emergency, and by special permission from the priest in charge of the retreat.

A retreat has been defined as "a continuous series of spiritual exercises." It is a form of divine worship, devoted to examination, contemplation, and meditation, and intended to improve and perfect the partici-

172

pants in serving God and their fellow men. Retreats are carried on in a quiet manner, and the participants are under the constant supervision of the retreat master, a Catholic priest.

This is not an ordinary zoning case. Rather it is a case which concerns freedom of religion—the most precious of all personal rights. Freedom of religion, together with freedom of speech and of the press, form a triumvirate of personal freedoms upon which human dignity and all personal liberties are based. If we are to understand the full meaning, the value, and the scope of religious freedom, we must remember the bloody history of religious persecution. We must remember that men have died by the thousands, that men have been tortured and quartered because they worshiped the God of their choice.

Repression and persecution of religious minorities were not unusual in colonial days. Our forefathers knew from personal experience the evil of religious persecution, and the value of religious liberty.[2] It was for this reason that the framers of the Bill of Rights placed freedom of religion ahead of all other personal liberties and incorporated it in the *first* article of the Bill of Rights.[3]

In the early days of the Republic, the first amendment applied only to the Federal Government, but later the fourteenth amendment[4] of the Constitution

[2] Eckenrode: Separation of Church and State; Jefferson: Notes on Virginia; Claude G. Bowers: The Young Jefferson, chapter VIII, "His Battle for Religious Freedom"; Hilldrup: Life of Pendleton, 91-92; Rives: Life and Times of James Madison, vol. I.

[3] First amendment of the Constitution of the United States: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ."

[4] ". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; . . ."

was interpreted to make the first amendment applicable to the States as well as to Congress: Near v. Minnesota ex rel Olson, 283 U. S. 697 (1931) ; Schneider v. The State of New Jersey (Town of Irvington), 308 U. S. 147 (1939) ; Cantwell et al. v. Connecticut, 310 U. S. 296 (1940) ; West Virginia State Board of Education et al. v. Barnette et al., 319 U. S. 624 (1943).

The people of the Commonwealth of Pennsylvania did not wait for the fourteenth amendment to protect their religious freedom. Our Constitution contains as strong a guarantee of religious freedom as can be found anywhere.[5]

It was because of the all-inclusive language of the first article of the Bill of Rights that in its first 150 years of history the Supreme Court of the United States was called to pass upon only one major case concerned with religious liberty. In 1878, in Reynolds v. the United States, 98 U. S. 145, the Supreme Court decided that the guarantees of religious liberty as embraced in the first amendment, did not extend to immoral or criminal acts, though they may be sanctioned by religious doctrine. In that case, the conviction of Reynolds, a Mormon living in the State of Utah, of the crime of polygamy, was upheld, despite the fact that the Mormon Church at that time approved of polygamy.

In 1931 the United States Supreme Court held that the fourteenth amendment of the Constitution made the first amendment applicable to the States.[6] This gave the Supreme Court jurisdiction to protect religious liberty against invasion by the States and caused a large number of cases involving religious freedom to come before the Supreme Court.

---

[5] Constitution of Pennsylvania, art. I, sec. 3: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; . . .".

[6] Near ex rel. Olson v. Minnesota, 283 U. S. 697.

Most of these cases originated because of the activities of a single religious sect, Jehovah's Witnesses, or the International Bible Students Association. It alone was responsible for bringing 16 cases upon this issue before the Supreme Court, in the short period from 1938 to 1943. These cases constitute a notable part of the recent history of our Bill of Rights. In these cases the Supreme Court gradually enlarged the concept of religious liberty, until today, religious freedom is built upon a solid rock, not to be tampered with by executive, legislative, or judicial action.

The concept of religious liberty has a double aspect: (1), it prohibits the Congress of the United States from enacting any law "respecting an establishment of religion", and (2), it safeguards the free exercise of the form of religion chosen by the individual. The first amendment prohibits Congress from compelling the citizens by law to accept any creed or to prescribe the form of worship. The individual is left entirely free to worship God as he may choose, according to the dictates of his own conscience, unrestricted by law, and uninfluenced by any branch of the government.

Thus, the Constitution *protects* both essential *elements* of religious freedom—the *freedom to believe,* and the *freedom to act on that belief.*

The freedom to believe is absolute, and permits of no interference of any kind or character by the State or the Federal Government. The freedom to act on that belief is of necessity subject to regulation where the protection of society requires such regulation. In the most recent decisions the Supreme Court of the United States has enlarged the freedom to act on one's religious beliefs and has narrowed the field within which society may legitimately interfere for its own protection.

In Davis v. Beason, 133 U. S. 333 (1890), another case dealing with a member of the Mormon Church engaged in polygamous practices, Justice Field, speaking for the court, said at page 342 that:

"It was never intended or supposed that the (first) amendment could be invoked as a protection against legislation for the punishment of acts *inimical* to the *peace, good order and morals of society.*" See also Reynolds v. United States, 98 U. S. 145. (Italics ours.)

More recently, in Cantwell et al. v. Connecticut, 310 U. S. 296 (1940), Justice Roberts, speaking for a unanimous court, held along similar lines that the ". . . State . . . may . . . safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment. . . ." (p. 304).[7]

In Murdock v. Pennsylvania, 319 U. S. 105 (1943), it was held, in a five-to-four decision, reversing Jones v. Opelika, 316 U. S. 584, and other recent decisions, that a municipal, nondiscriminatory ordinance which required religious colporteurs to pay a license tax as a condition to the pursuit of their activities, is invalid

---

[7] Cantwell v. Connecticut, 310 U. S. 296, 304:

". . . The freedom to act (in the exercise of religious practices) must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. No one would contest the proposition that a State may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee. It is equally clear that a State may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment."

under the Federal Constitution as a denial of freedom of speech, press and religion.[8]

The power of the individual to act in the exercise of his religious freedom is not absolute, and neither is the power of the State to regulate such action.[9]

The State may prescribe necessary regulations in the exercise of its police power provided such regulations do not "unduly infringe" on the freedom of religion. The Supreme Court has not defined the precise boundaries which would indicate precisely which regulations are proper and which are an undue infringement. We believe, and so hold, that to be proper and constitutional, such regulations prescribed in the exercise of the police power of the State must not be unreasonable, unnecessary, or arbitrary, and must have a

---

[8] The case of Jones v. Opelika, 316 U. S. 584, was a five-to-four decision with Mr. Byrnes being a member of the majority of five. Three years later when the case came before the Supreme Court again on reargument, the orginal decision was vacated, and it was held that the municipal ordinance which, as construed, required religious colporteurs to pay a license tax was unconstitutional, as a denial of freedom of speech, press, and religion: Murdock v. Pennsylvania, 319 U. S. 105 (1943). This was again a five-to-four decision. It is interesting to note that Mr. Justice Byrnes had resigned in the meantime and his place had been taken by Mr. Justice Rutledge, who took a position opposite to that of Mr. Byrnes. Thus this change in the membership of the court brought about a reversal of the court's position. This is the second such instance in the history of the Supreme Court, the other instance being the legal tender cases when the Supreme Court in Knox v. Lee, 12 Wallace 457 (1871), reversed Hepburn v. Griswold, 8 Wallace 603 (1870), after Mr. Justice Strong and Mr. Justice Bradley had joined the court.

[9] The State has the power to make war, raise armies and draft its citizens for military service (Selective Draft Law Cases, 245 U. S. 366 (1917)), and despite their religious objections citizens may be subjected to military training: Hamilton v. Regents, 293 U. S. 245 (1934). The State cannot compel children to attend a public school and exclude attendance in a private school where they receive religious instruction: Pierce v. Society of Sisters, 268 U. S. 510 (1925).

real, tangible and substantial relation to the public health, safety, morals or general welfare.[10]

The contention of petitioners, if upheld, would limit the religious freedom of the Third Order of St. Francis on its own property to act upon, and put into practice its religious beliefs and to follow the methods which the order has chosen.

Petitioners' contentions, as stated in their brief, are:

First: That the use of the building located in the rear of the property of the order as sleeping quarters for retreatants, during the conduct of closed spiritual retreats extending for a period longer than one day, "is not an accessory use customarily incident to the permitted use of property as a church".

Second: "The use of the rear building . . . as sleeping quarters for retreatants during the conduct of closed spiritual retreats extending for a period longer than one day is not an accessory use customarily incident to the religious services performed in St. Francis Retreat Chapel".

Third: That "a retreat house . . . is not a church within the usual and ordinary meaning of the word 'church', even though it has connected with it a chapel and Stations of the Cross".

We are certain that petitioners do not intend to limit or interfere with the religious practices and concepts of the order and that they do not interpret their posi-

[10] Nectow v. Cambridge et al., 277 U. S. 183; White's Appeal, 287 Pa. 259; Standard Investments Corporation's Petition, 341 Pa. 129. Where the "effect upon the community would be too slight", the State cannot act: Village of University Heights v. Cleveland, 20 Fed. Sec. 743, 745 (certiorari denied by United States Supreme Court). In Minersville School District v. Gobitis, 310 U. S. 586 (1940), Stone, J., dissenting, said at page 602, that the Government "may suppress religious practices dangerous to morals, and presumably those also which are inimical to public safety, health and good order". This case was reversed in West Virginia State Board of Education v. Barnette, 319 U. S. 624 (1943), and the dissenting opinion of Justice Stone was followed.

tion as a limitation or interference with religious freedom. But, under the decisions, it would seem that if the contentions of petitioners were upheld, there would be an interference with and violation of the freedom of religion, as guaranteed by the Federal and State Constitutions.

We shall discuss these contentions in the order named. Petitioners contend that the use of the rear building "as sleeping quarters for retreatants during the conduct of closed spiritual retreats extending for a period longer than one day", is not as a matter of fact and as a matter of law an "accessory use customarily incident" to the use of the property of the order as a church. This contention is immaterial.

The religious freedom guaranteed by our Federal and State Constitutions is the freedom to worship Almighty God according to the dictates of one's own conscience, and in exercising such worship to adopt such practices as one sees fit, or deems appropriate. Neither the State nor the Federal Government are permitted to dictate or influence religious doctrines, concepts, or *practices*.

The flaw in petitioners' position is the word "customarily" incident to the use of the property as a church.

Factually, petitioners contend that the practice of retreats, as it originated with St. Ignatius de Loyola, and as approved by the Apostolic See, "does not contemplate that the spiritual exercises of a retreat are to be performed in a church"; that retreats "are primarily the individual meditations of the retreatant"; that they "do not require that those spiritual exercises should be performed in a church", and that "it has become the practice in most instances to incorporate into the retreat house as incidental to the primary spiritual exercises a chapel". These contentions are irrelevant. Where religious beliefs or practices are

involved, the constitutional principle of freedom of religion demands that we do not concern ourselves with what is required by other religious sects, or even by the religious authorities of the same church, or what is the usual practice in performing certain religious activities. Religious freedom, as that term is used in the State and Federal Constitutions, means that the individual group or sect is *free to deviate from what is customary* or done "in most instances", or from what is approved by others. Religious freedom means *freedom to follow* not only one's own beliefs, but *one's own practices* and procedures, unhampered and uninfluenced by majority practices or by customary rules or regulations made by others, whoever they may be. Religious freedom is absolute freedom to follow one's own beliefs. As far as religious practices are concerned, society may impose limitations, but only where substantial considerations of public health, safety, morals, and public welfare so require.

The question as to what is customary or what is unusual in the religious practices of the Third Order of St. Francis is, therefore, entirely irrelevant. Neither the city, the State, the Federal Government, nor this court, has, under the Federal and State Constitutions, the right to tell the order that it should confine itself strictly to the practice of retreats as prescribed by St. Ignatius de Loyola, or even as they may be prescribed by the Holy Father. It is not for us, nor for any other branch of the Government to advise the Order of St. Francis that it should be satisfied with days of recollection which last only one day, rather than engage in closed retreats which under the practices of this order, last for two days.

The same is true regarding the question as to what is or is not a "church". It is not within our province to define with precision what is or is not a church. The framers of the zoning ordinance wisely omitted to

supply such a definition. What may be a sacred church building to one denomination or religious sect may not meet the test of another denomination or group. There are many excellent definitions, but they are not controlling. We could define a "church" as a "building set apart for public worship," or "a place of worship of any religion" (Webster's New International Dictionary, 2nd ed.), or could quote the definition contained in canon 1161 of the Roman Catholic Church as "a sacred edifice dedicated to divine worship, especially with a view to enabling all the faithful to practice public worship."

Justice Frankfurter in his dissent in West Virginia State Board of Education et al. v. Barnette et al., 319 U. S. 624, says "it is unnecessary to attempt a definition of religion".[11] We believe that such a definition—if, as the term would indicate, it is to be a definitive delineation and is to control our future decisions—would be harmful and a danger to religious freedom.

The Third Order of St. Francis is a Catholic order and, as such, a part of the Catholic Church. How far the canons of the church, the precepts and rules of the church, or the pronouncements of the Holy Father are binding on that order is a matter purely between the Apostolic See and the order; it is not a matter within the competence of any branch of the Government, nor is it proper for the court in a proceeding of this kind to determine and enforce, or to construe and apply the

---

[11] 319 U. S. 624, 658:

" 'It is unnecessary to attempt a definition of religion; the content of the term is found in the history of the human race and is incapable of compression into a few words. Religious belief arises from a sense of inadequacy of reason as a means of relating the individual to his fellowmen and to his universe. . . . (It) may justly be regarded as a response of the individual to an inward mentor, call it conscience or God, that is for many persons at the present time the equivalent of what has always been thought a religious impulse.' United States v. Kauten, 133 F. 2d 703, 708."

canons of the Catholic Church. As far as this court is concerned, and as far as the City of Pittsburgh and the State of Pennsylvania are concerned, the Third Order of St. Francis may pursue any religious practice that, in its sole discretion and judgment, it sees fit or decides to pursue, unless such practice substantially interferes with rules laid down for the protection of society; rules, moreover, which as we have already stated, are subject to severe limitations.

What we have already said applies with equal force to the contention of petitioners, that the performance of the spiritual exercises of a retreat does not require that those spiritual exercises be performed in a church, and to the contention that it has become the practice, in most instances, to attach a chapel as an accessory use to a retreat house, rather than a retreat house as an accessory use to a church. From what we have already said, it is clear that that is a matter solely for the decision and judgment of the order itself, and not a matter of practice, or custom of other religions, or even of groups, or sects, or orders within the same religion. Such is the force and the strength, and indeed the beauty, of the principle of religious freedom that it sets the individual *free—free* to believe, and *free* to exercise that belief, as his *free* will may dictate.[12]

Petitioners contend that the use of the rear building on the property of the order for sleeping quarters for retreatants, during closed retreats, will "reduce the

---

[12] Minersville District v. Gobitis, 310 U. S. 586, Justice Stone's dissent, p. 604:

"The guaranties of civil liberty are but guaranties of freedom of the human mind and spirit and of reasonable freedom and opportunity to express them. They presuppose the right of the individual to hold such opinions as he will and to give them reasonably free expression, and his freedom, and that of the state as well, to teach and persuade others by the communication of ideas. The very essence of the liberty which they guaranty is the freedom of the individual from compulsion as to what he shall think and what he shall say, . . .".

comfort and privacy of petitioners' properties as one-family dwellings", and will substantially reduce the market value of petitioners' properties. The burden to establish these contentions was on petitioners. They failed to meet that burden.

Petitioners have argued strongly that the fair market value of their properties will be reduced to an extent of 20 to 75 percent, depending upon the size of their homes and the proximity of their homes to the property of the order. It is difficult to look into the future, especially when one deals with as intangible a matter as "the fair market value" of real estate.

The real estate experts who testified for petitioners were not convincing. They did not testify to any specific instances which would indicate that prospective purchasers were deterred or adversely influenced by the pendency of the occupancy and use permit in this case. Their testimony was based largely on their observation of the results of the invasion of fine residential districts by multiple dwellings and apartment houses. There is a vast difference between a busy apartment building with its coming and goings and the quiet atmosphere of a retreat house. These experts have given little if any consideration to the quiet dignity, the peace and good order, and to the absence of all noises and even conversation, which is of the very essence of a closed retreat.

The same observations apply to the testimony of the property owners.

The real estate expert for the order expressed the opinion that the issuance of the permit would not affect real estate values in the neighborhood.

A consideration of the evidence of the witnesses on both sides of the case does not justify a finding that the issuance of the permit here involved will injuriously affect the market value of the properties of petitioners.

In connection with this phase of the case, we should add the observation that property rights are not controlling where we are dealing with religious freedom as guaranteed by the Constitution. The eternal, spiritual values which are inherent in the teachings of any of the great religions are more important than merely material or economic considerations. The spiritual values and the high ethical teachings of the great religions hold society together. Relegate them to the background, push them out of our life, and society may well fall apart. History teaches that undue emphasis upon the glorification of merely material well-being has always led to the drying up of the mainsprings of society and the crumbling of the state. Especially today, when our form of society is beset by a most bitter and cunning enemy, who stresses a gross and perverse form of materialism at the expense of human dignity, human worth, and human freedom, emphasis upon the ideal, the noble, and the spiritual is required more than ever before.

In Marsh v. Alabama, 326 U. S. 501, 509 (1945), a case involving freedom of religion, Justice Black, speaking for the majority, held that freedom of religion occupied a "preferred position".[13]

In Murdock v. Pennsylvania, 319 U. S. 105, 115, Justice Douglas, speaking for the court, stressed the primacy of the constitutional freedoms, saying that, "Freedom of press, freedom of speech, freedom of re-

---

[13] Marsh v. Alabama, 326 U. S. 501, 509:

"When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the *latter occupy a preferred position*. As we have stated before, the right to exercise the liberties safeguarded by the First Amendment 'lies at the foundation of free government by free men' and we must in all cases 'weigh the circumstances and . . . appraise the . . . reasons . . . in support of the regulation . . . of the rights.' Schneider v. State, 308 U. S. 147, 161. . . ." (Italics ours).

ligion are in a preferred position", even over license taxes which are needed for the general support of the State, and which in many adjudicated cases had been given a superior position. See also Jones v. Opelika, 316 U. S. 584, 609, dissenting opinion of Chief Justice Stone; Follett v. McCormick, 321 U. S. 573, 577.

In Martin v. Struthers, 319 U. S. 141 (1943), a city ordinance which made it unlawful to knock on doors, ring door bells, or otherwise summon to the door the occupants of any residence for the purpose of distributing to them religious leaflets was held invalid, as a violation of the freedom of religion and of speech and press. The right to freedom of religion and speech was held superior to the right of persons not to be disturbed or annoyed or to be summoned from their sleep by the ringing of a door bell.

In United States v. Hillyard, 52 F. Supp. 612 (1943), refusal of a member of Jehovah's Witnesses to serve as a juror because of his religious beliefs was sustained under the first amendment of the Federal Constitution.

A review of these cases shows that the constitutional principle of religious freedom has received a broad and liberal interpretation.

As already indicated, religious practices (as distinguished from beliefs) may be limited or prohibited by the State, where they substantially and in a tangible manner endanger public health, safety, morals, good order, or the public welfare. The threat to the health, good order, and morals of the community must be a very real, substantial, and tangible one. Mere inconvenience is not sufficient.

The case before us does not present any facts which would permit the State to interfere.

The public health is not affected by the use of the permit approved by the board of adjustment.

These retreats cannot fail to elevate the moral and spiritual values of each retreatant, and thus raise the general standards of public morals. Thus, public morals, if anything, should be favorably influenced by the practice of closed retreats.

Public safety is not involved. The increase in traffic, caused by the relatively small number of retreatants in attendance at any one time, cannot possibly have any appreciable influence on the heavy flow of traffic which traverses Beechwood Boulevard at all times. Parking space on the premises of the order is adequate, and the retretatants would cause no more additional traffic or parking than social events and parties, which are normally and customarily incident to the social life of occupants of large residential homes, such as are here involved.

Another ground for interference is presented where there is conduct inimical to the public welfare and good order of the community. On this point also, there is no basis for intervention. Retreatants should become better persons because retreats are based on spiritual concepts of a high ethical order and the community can only be benefited by the spiritual and ethical improvement of a part of its citizenry.

As far as the personal and property rights of petitioners are concerned, we have already held that under the evidence here presented we cannot find that they are substantially affected by the closed retreats here proposed, and by the use of the rear buildings on the property of the order as sleeping quarters for retreatants.

We must still consider the question of whether the Zoning Ordinance of the City of Pittsburgh allows the use of the rear building of the property of the order as sleeping quarters for retreatants and, if it fails to do so, whether the order of the board of adjustment issuing such a permit is a proper exercise of the dis-

cretion vested in that board or a flagrant abuse of its discretionary powers.

The area involved is located in a class C residence district: Sec. 9-A of the zoning ordinance. This section specifically lists the following as "permitted uses" (page 26 of Zoning Ordinance) :

"(1) One Family Dwelling;

(2) Church;

(3) Library;

(4) Greenhouse (As an accessory building) ;

(5) Accessory Uses: (The provisions shall be the same as prescribed in 'A' Residence District. See Section 8) ."

Under the accessory uses permitted by section 8 of the zoning ordinance is (page 24) :

"(a) Accessory Uses customarily incident to the above uses."

Thus, the Zoning Ordinance of the City of Pittsburgh permits as accessory uses, "uses customarily incident" to a permitted principal use. Petitioners contend that the use of a building as sleeping quarters for retreatants is not an accessory use, which is *customarily* incident to the use of a structure as a church. The evidence abundantly supports that position.

The zoning board interpreted that provision of the ordinance as having reference to a particular church and not to churches generally.[14] That interpretation is not a reasonable interpretation of the zoning ordinance. It cannot be adopted without doing violence to its terms.

The provision in question reads as follows (section 8 of zoning ordinance) :

---

[14] Seventh finding and conclusion which reads as follows:

"On the facts of this case, we find that the use requested is an accessory use of the conduct of the church on appellant's property, that is customarily incident to the conduct of *that particular church*, and that it does not involve the conduct of a business." (Italics ours).

"(12) Accessory Uses incident to any of the principal uses above listed and not involving the conduct of a business.

"These accessory uses shall be : *Accessory uses* customarily incident to the above uses." (Italics ours)

It is clear that the words "customarily incident to the above uses" referring to homes, churches, etc., relate to the use of a property as a home or a church. It does not relate to a particular home, nor does it relate to a particular church. This section of the zoning ordinance is concerned with types of properties, and not with the individual or particular characteristics of specific properties.

The board erred in interpreting the term accessory use in that manner. That error, however, is academic as far as this case is concerned, because in our considered opinion the whole clause relating to accessory uses (clause (5) of section 9-A and clause (12) and (12) (a) of section 8) is not applicable to churches.

Article II of the zoning ordinance contains definitions for practically all the major terms used. These definitions occupy four printed pages (14 to 17). As already observed there is no definition of the term "church". The failure to define that term may well be a recognition of the constitutional principle of freedom of religion which does not vest the authority in any public body to determine definitively what is or is not a church. Any building in which a religious group or sect worships Almighty God according to its own practice is a church.

In listing churches as a permissive use in class C residence areas (the highest residence area established by the ordinance)[15], the framers of the zoning ordinance recognized the primacy of religious freedom. If the zoning ordinance would not permit churches in all

---

[15] Section 9-A of zoning ordinance.

residence districts, including C districts, it would to that extent be unconstitutional. It was so held in City of Sherman v. Simms et al., 143 Tex. 115, 163 S. W. (2d) 415 (1944).[16]

In an annotation in 138 A. L. R. 1287, 1288, under the heading of "Zoning regulations as affecting churches", the law is summarized, as follows:

"In the relatively few cases in which the question has been considered, the view has consistently been taken that an administrative application of a zoning ordinance which operates to exclude the erection of church buildings in residence districts is invalid, either as violative of the due process and equal protection clauses of the State and Federal Constitutions, or as being an arbitrary or unreasonable enforcement of the ordinance."

In State ex rel. Bishop of Reno v. Hill (1939), 59 Nevada 231, 90 P. (2d) 217, a zoning ordinance which prohibited the erection of any building, not of a residential character, without the written consent of a

---

[16] It is interesting to note in that connection an extensive report on "Zoning" contained in a book published under the sponsorship of the Russell Sage Foundation by Edward M. Bassett. As a part of the history of zoning, the author states that (page 70):

"When in 1916 the framers of the Greater New York building zone resolution were discussing what buildings and uses should be excluded from residence districts, it did not occur to them that there was the remotest possibility that churches, schools, and hospitals could properly be excluded from any districts. They considered that these concomitants of civilized residential life had a proper place in the best and most open localities."

And at page 200:

"Practically all zoning ordinances allow churches in all residence districts. It would be unreasonable to force them into business districts where there is noise and where land values are high, or into dense residence districts (in cities which have established several kinds of such districts). Some people claim that the numerous churchgoers crowd the street, that their automobiles line the curbs, and that the music and preaching disturb the neighbors. Communities that are too sensitive to welcome churches should protect themselves by private restrictions."

designated percentage of property owners in the immediate vicinity, was held to be unconstitutional, as violating the first and fourteenth amendments of the United States Constitution, when applied to the proposed erection of a church building. To the same effect are State ex rel. Westminster Presby. Church v. Edgcomb (1922), 108 Neb. 859, 189 N. W. 617, 27 A. L. R. 437; and State of Ohio ex rel. Synod of Ohio v. Joseph, 139 Ohio 229, 39 N. E. (2d) 515, 138 A. L. R. 1274; and also State ex rel. Howell v. Meador et al. (1930), 109 W. Va. 368, 154 S. E. 876.

As already noted, the term "church" is not defined in the ordinance and under the Constitution of this State and the first and fourteenth amendments of the Federal Constitution that term must be given the most inclusive and all-embracing definition. When a property located in a C residence district, or any other district, is used for a church, it may be used, without any violation of the zoning ordinance, for any purpose connected with the religious practices which the group or sect maintaining *that* particular church desires to pursue, unless there is a subtantial and unreasonable interference with, or injury to public health, morals, safety, and public welfare.

The term "church" as used in section 9-A of the zoning ordinance must be interpreted in that broad manner, if that part of the ordinance is to be constitutional.

We are required to so construe an act of assembly as to render it constitutional.[17] Under this interpretation, the term "accessory uses" has reference only to "One Family Dwelling", "Library" and "Greenhouse", and is not applicable to the term "Church". Any at-

---

[17] Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 552; the rules of construction applicable to zoning ordinances are the same as those applied to statutes: Marple Township v. Lynam, et al. 151 Pa. Superior Ct. 288, 291.

tempt to limit the use which a congregation makes of a church to uses that are customarily incident to *other* churches, would be an unconstitutional invasion of freedom of religion.

We have so far dealt with an analysis of the meaning and scope of the term "freedom of religion", as guaranteed by the Constitutions of our State and Nation, and with the effect of the principles of freedom of religion upon zoning laws in general and upon the Zoning Ordinance of the City of Pittsburgh in particular. Our decision upholds the contention that the order has a constitutional right to use its entire property on Beechwood Boulevard for the holding of closed spiritual retreats, including the use of the rear building as sleeping quarters for retreatants.

Aside from the protection of the Constitution, the order has in its favor the decision of the board of adjustment.

In the exercise of powers delegated to it, the board of adjustment, in the instant case, overruled the superintendent of the bureau of building inspection, and granted the application of the Third Order of St. Francis for a certificate of occupancy of the rear building on its property for use as sleeping quarters for retreatants. The board held that such use was an "accessory use" permitted under the ordinance, and specifically stated that, "If it were required under the zoning ordinance, we would have no hesitancy in granting a certificate of variance. The granting of the application is an act of simple justice and carries out the spirit of the zoning ordinance. A refusal of the application would be contrary to the spirit of the zoning ordinance and would work a substantial and serious hardship. The church on the property should be permitted to carry on its normal activities and it cannot do so when it is denied the right to use its available property in the conduct of closed spiritual retreats".

We have already held that the board of adjustment was in error in its interpretation of the term "accessory use", as the same is used in section 8 of the zoning ordinance. We have also held that the term "church", as used in section 9 of the ordinance, properly construed in the light of the constitutional guarantees of freedom of religion, requires the issuance of the permit here sought by the third order. Furthermore, it is clear from the opinion of the board of adjustment that that board would exercise its power to grant a variance, if that were necessary.

The power of the City of Pittsburgh to establish a zoning ordinance is derived from the Act of March 31, 1927, P. L. 98. That act provides that zoning ordinances can be enacted only "for the purpose of promoting health, safety, morals or the general welfare of the community, . . ." (sec. 1).[18]

The legislature realized from the beginning that uniform zoning regulations might in individual instances create unnecessary and unreasonable hardships, and that power should be lodged somewhere to grant special exceptions to avoid individual injustice, where that can be done in harmony with the general purposes and intent of the ordinance. For that purpose the legislature made it mandatory for any municipality which enacted a zoning ordinance to appoint a board of adjustment, and conferred upon that board the power "in appropriate cases and subject to appropriate conditions and safeguards", (to) "make special

[18] Section 1:

"Be it enacted, etc., That for the purpose of promoting health, safety, morals or the general welfare of the community, cities of the second class are hereby empowered to regulate, restrict or determine, the height, number of stories and size of buildings and other structures, the percentage of lot that may be built upon, the size of yards, courts and other open spaces, the density of population, and the location, use and occupancy of buildings, structures and land for trade, industry, residence or other purposes."

exceptions to the terms of the ordinance, in harmony with its general purpose and intent, and in accordance with general or specific rules therein contained".

In addition to this general statement of policy, the legislature, in enumerating the powers of the board of adjustment, specifically listed the power to grant a variance:

"To authorize upon appeal in specific cases such variance from the terms of the ordinance as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of the ordinance will result in unnecessary hardships and so that the spirit of the ordinance shall be observed and substantial justice done." (Section 7 (3)).

The Council of the City of Pittsburgh used similar language in the zoning ordinance in defining the power of the board of adjustment to grant a certificate of variance.[19]

It will be noted that the granting of a variance or the making of an exception from the general terms of the zoning ordinance is an administrative function, *vested in the board of adjustment*, and not a judicial function, to be exercised by the courts.

We have no power to overrule the board of adjustment in the exercise of this discretionary power, unless its decision is arbitrary, capricious, and unreasonable, or clearly in violation of positive law: Floersheim Appeal, 348 Pa. 98; or, as it is sometimes

---

[19] Section 54 of Ordinance of City of Pittsburgh of July 30, 1923, as amended:

". . . Where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this ordinance, the Board shall have the power in passing upon appeals to vary or modify any of the regulations or provisions of this ordinance in harmony with its general purpose and intent and in accordance with the general or specific rules herein contained so that the spirit of this ordinance shall be observed, the public health, the public safety and the general welfare secured and substantial justice done. . . ."

stated, unless there is a "manifest and flagrant abuse of discretion": Jennings' Appeal, 330 Pa. 154, 157; Liggett's Petition, 291 Pa. 109, 117; Reininger Zoning Case, 362 Pa. 116, 117; Berman et al. v. Exley et al., 355 Pa. 415; Elkins Park Improvement Association Zoning Case, 361 Pa. 322, 325; Overbrook Farms Club v. Philadelphia Zoning Board of Adjustment, 351 Pa. 77, 82; Perelman et al. v. Yeadon Borough Board of Adjustment et al., 144 Pa. Superior Ct. 5, 10, 11.

In the instant case the board of adjustment, in holding that it would grant a variance, made a reasonable decision, in harmony with the general purposes and intent of the zoning ordinance and in the public interest. Any other decision would result in unnecessary hardship, and would do substantial injustice to the order.

Under the decisions quoted the order of the board of adjustment must be sustained. If the board had acted otherwise, and had refused the permit here requested, we would be obliged to reverse it and issue the permit. . . .